b

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

MACK LAMAR MELTON,
Appellant

CIVIL DOCKET NO. 1:18-CV-00475

VERSUS

JUDGE DRELL

UNITED STATES
COMMISSIONER OF SOCIAL
SECURITY,
Appellee

MAGISTRATE JUDGE PEREZ-MONTES

---

REPORT AND RECOMMENDATION

Mack Lamar Melton appealed the final decision of the Commissioner of Social Security ("the Commissioner"). Because substantial evidence supports the Commissioner's decision that Melton is not disabled by his pain, learning disability, and bipolar I disorder, Melton's appeal should be denied.

I.    Background

A.    Procedural Background

Mack Lamar Melton filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[1] on August 15, 2015, alleging a disability onset date of February 15, 2015 (ECF No. 13-1 at 173, 179) due to "bipolar, manic depression, leg pain, back pain" (ECF No. 13-1 at 209). Those applications were denied by the Social Security Administration ("SSA"). ECF No. 13-1 at 104.

---

[1] Melton's SSI application was filed jointly with his wife, Kimberly Melton.

A de novo hearing was held before an Administrative Law Judge ("ALJ") at which Melton appeared with his attorney and a vocational expert ("VE"). ECF No. 13-1 at 33. The ALJ found that Melton has severe impairments of degenerative disc disease; left shoulder impingement; residuals from being hit by a car including bilateral lower extremity pain; obesity; bipolar disorder; intermittent explosive disorder; anxiety; and depression (ECF No. 13-1 at 19). Still, the ALJ found he has the residual functional capacity to do a limited range of sedentary work (ECF No. 13-1 at 27). Thus, the ALJ concluded that Melton was not disabled from February 15, 2015 through the date of her decision on April 3, 2017. ECF No. 13-1 at 28.

Melton requested a review of the ALJ's decision, but the Appeals Council declined to review it (ECF No. 13-1 at 5) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Melton filed this appeal for judicial review of the Commissioner's final decision. Melton contends the ALJ erred in failing to find his mental and physical problems prevent him from working. ECF No. 18.

### B.    Factual Background

#### 1.    Medical and Other Records

On February 23, 2013, Melton went to the Riverland Medical Center emergency room, reporting hematuria without pain. ECF No. 13-1 at 414-15. Melton ambulated without difficulty (ECF No. 13-1 at 425-26) and was able to void without difficulty (ECF NO. 13-1 at 425a). Melton had blood in his urine, as well as opiates and tricyclic (anti-depressant). ECF No. 13-1 at 421-22. The doctor noted

Melton's behavior seemed to be drug-seeking, and referred him to a urologist. ECF No. 13-1 at 423. Melton was diagnosed with flank pain and prescribed Lortab. ECF No. 13-1 at 415-16.

On February 28, 2013, Melton returned to the Riverland Medical Center emergency room, stating he had stepped in a hole and his left ankle was painful. ECF No. 13-1 at 428-29. Melton was not in apparent distress, and had a tender left ankle without swelling. ECF NO. 13-1 at 430. X-rays showed an orthopedic plate and screw fixation devised overlying the distal fibula, a connecting screw between the fibula and tibia that appeared to be broken, and arthritis. ECF No. 13-1 at 430, 437. Melton was diagnosed with sprain/strain of ankle, given an Ace wrap on his left ankle, and prescribed Medrol and Ibudone. ECF NO. 13-1 at 429.

In March 2013, Melton was evaluated at the Concordia Community Health Center[2] for chronic hypertension (benign), anxiety, and radiculitis (thoracic or lumbar). ECF No. 13-1 at 361. Melton complained of headache, anxiety, back pain, and joint pain. ECF NO. 13-1 at 362. Melton was provided Tramadol until he could see his regular doctor. ECF NO. 13-1 at 363. In April 2013, at the Concordia Community Health Center, Melton saw a physician and requested Cymbalta for his anxiety and depression, stating he was preparing to attend the police academy for training. ECF NO. 13-1 at 364. Melton was provided a trial of Cymbalta and a few Xanax until he could see his regular doctor, and his Tramadol was refilled. ECF No. 13-1 at 366.

---

[2] The Concordia Community Health Center (in Ferriday) and the Medical Center (in Sicily Island) are both part of the Catahoula Parish Hospital District No. 1. ECF No. 13-1 at 361.

In April 2013, Melton reported to the emergency room with complaints of hand pain and injury. ECF No. 13-1 at 440. Melton did not have abrasions, deformities, or edema (ECF No. 13-1 at 443), and x-rays were normal (ECF No. 13-1 at 447). Melton had pain on movement and palpation of his left hand and a diminished range of motion. ECF NO. 13-1 at 441. He was diagnosed with sprain/strain of his hand and prescribed Vicoprofan. ECF No. 13-1 at 446.

In June 2013, Melton went to the emergency room and complained of mild back pain bilaterally. ECF No. 13-1 at 459. Melton ambulated without difficulty. ECF No. 13-1 at 465. Melton was prescribed Ultram (tramadol) and Flexeril for his back pain. ECF No. 13-1 at 459, 461. In September 2013, Melton reported continued back pain; both his Ultram and Tegretol prescriptions were refilled. ECF No. 13-1 at 522.

In September 2013, Melton went to the emergency room for right knee pain caused by falling and twisting it. ECF No. 13-1 at 497, 501. Melton had pain on movement and palpation (ECF No. 13-1 at 498). X-rays showed no fracture, dislocation, or soft tissue abnormality. ECF No. 13-1 at 506. A sprain/strain of the knee was diagnosed, and Melton was given a knee immobilizer and prescribed Lortab. ECF No. 13-1 at 497, 502.

On October 7, 2013 at the Concordia Community Health Center, Melton complained of increased anxiety and stress; he had a history of bipolar disorder and anxiety. ECF No. 13-1 at 367. Melton stated he had an appointment with a mental health provider in one month. ECF No. 13-1 at 367-68. Because Melton could not

4

afford Cymbalta, he was given a temporary prescription for Xanax, as well as a refill on Tegretol.  ECF No. 13-1 at 369.

On October 10, 2013, Melton went to the emergency room with complaints of chronic mild back pain bilaterally that started when he fell out of his recliner and strained his lower back.  ECF NO. 13-1 at 539.  Melton had lumbar pain on movement, but no pain on palpation and no tenderness.  ECF No. 13-1 at 541. Melton ambulated without difficulty.  ECF No. 13-1 at 545.  Melton was diagnosed with lumbar strain and behavior disorder, and prescribed a Lidoderm patch, Vicoprofen, and prednisone.  ECF No. 13-1 at 539.

On October 17, 2013, Melton again reported mild chronic back pain bilaterally at the emergency room.  ECF No. 13-1 at 548.  It was noted that Melton was seen often for pain medication.  ECF No. 13-1 at 548.  Melton ambulated without difficulty.  ECF No. 13-1 at 554.  Melton was diagnosed with back pain and prescribed methocarbamol.  ECF No. 13-1 at 548.

On October 20, 2013 at the Natchez Community Hospital, Melton complained of back pain (at rest and with movement) radiating to both legs.  ECF No. 13-1 at 324-25.  Melton had moderate pain in the lumbar area and left and right low back. ECF No. 13-1 at 326.  Melton's range of motion was normal, but he had muscle spasms in the left and right low back.  ECF No. 13-1 at 326.  Melton was diagnosed with myofascial lumbar strain and prescribed Norco and Valium.  ECF No. 13-1 at 323.

On October 23, 2013, Melton went to the Medical Center in Sicily Island and complained of lower back pain and right knee pain. ECF No. 13-1 at 370. Melton was diagnosed with bipolar I disorder and lumbago. ECF No. 13-1 at 372. Melton was prescribed Cymbalta, Flexeril, Lortab, naproxen, and Pepcid, and his Tegretol was refilled for his bipolar disorder. ECF No. 13-1 at 372.

On October 29, 2013, Melton again reported to the emergency room with complaints of chronic moderate facial pain, caused when he was struck in the left side of his face with a pipe two months ago and sustained a chip fracture of his left maxilla tooth. ECF No. 13-1 at 557. Melton stated his dentist's office was closed that day and asked for something to "deaden it." ECF No. 13-1 at 557. Melton had tenderness to palpation over the root of his tooth and his left cheek, but no edema or erythema. ECF NO. 13-1 at 558. Melton was given a lidocaine injection. ECF No. 13-1 at 559. Melton was also prescribed Tramadol. ECF No. 13-1 at 557.

In November 2013 at the Natchez Community Hospital, Melton complained of right knee pain with decreased range of motion due to a chronic condition; Melton was able to walk with mild difficulty and fully bear weight. ECF No. 13-1 at 315-16. Melton's symptoms were aggravated by weight-bearing and bending the knee. ECF No. 13-1 at 316. Melton related a history of knee surgery (right tibia/fibula fracture with pins/rod). ECF No. 13-1 at 316. Melton was prescribed Ultram. ECF No. 13-1 at 315.

Also in November 2013, Melton was treated at the Medical Center for bipolar I disorder. ECF No. 13-1 at 374. Melton complained of abusive interactions with

6

others occurring about three times per week, and asked to have his medication increased. ECF No. 13-1 at 374. Melton was oriented to time, place, person, and situation, and displayed an appropriate mood and affect. ECF No. 13-1 at 376. Melton was 5' 11" tall, weighed 246 pounds, and his blood pressure was 134/70. ECF No. 13-1 at 374-75. He had a normal range of motion, muscle strength, and stability in his extremities with no pain on motion. ECF No. 13-1 at 376. Melton was diagnosed with bipolar I disorder under fair control, obesity, and chronic thoracic or lumbar radiculitis, and was given routine refills. ECF No. 13-1 at 376. Melton returned to the Medical Center on January 2, 2014, was diagnosed with controlled bipolar I disorder, obesity, and controlled thoracic or lumbar radiculitis and he was again given prescription refills. ECF No. 13-1 at 377-80.

On January 12, 2014, Melton went to the emergency room for mild to moderate shoulder pain. ECF No. 13-1 at 565. Melton's right shoulder had an abduction deficit, diminished range of motion, tenderness, and was warm. ECF No. 13-1 at 566. Melton was diagnosed with arthropathy and prescribed Ultram and prednisone. ECF No. 13-1 at 565.

On January 21, 2014, Melton was treated at the Natchez Community Hospital for back pain radiating down his left leg, worse with movement. ECF No. 13-1 at 352. Melton was diagnosed with acute exacerbation of chronic back pain and prescribed acetaminophen with codeine. ECF No. 13-1 at 354.

In March 2014, Melton was evaluated at the Medical Center for chronic benign hypertension and chronic thoracic or lumbar radiculitis. ECF No. 13-1 at

7

381.  Melton weighed 236 pounds and his blood pressure was 127/79.  ECF No. 13-1 at 382.  CT scans of Melton's brain and sinuses were normal.  ECF No. 13-1 at 410-11.  Melton was given prescription refills.  ECF No. 13-1 at 382.  Melton was re-evaluated in April 2014, and found to be oriented and have appropriate mood and affect.  ECF No. 13-1 at 385.  Melton's prescriptions for Lortab (for radiculitis) and Tegretol (for bipolar I disorder) were refilled.  ECF No. 13-1 at 386.

On July 2, 2014, Melton was evaluated at the Medical Center for back and joint pain.  ECF No. 13-1 at 387.  Melton's lumbar spine had mild pain with motion.  ECF No. 13-1 at 388.  Melton was assessed with lumbago and radiculitis, thoracic or lumbar.  ECF NO. 13-1 at 388.  Melton went to the emergency room on July 7, 2014 with complaints of moderate low back pain.  ECF No. 13-1 sat 585.  Melton's musculoskeletal exam was normal.  ECF No. 13-1 at 586.  Melton was diagnosed with lumbosacral strain  and prescribed Norco and Flexeril.  ECF No. 13-1 at 584.

In September 2014, at the Medical Center, Melton reported he had been taking Lortab because he has leg surgery 20 years ago.  ECF No. 13-1 at 390.  Melton complained that his pain was worsening and he had noticed a slight deformity to the "arch of the lower leg."  ECF No. 13-1 at 390.  Melton had pain in his right lower leg with ambulation.  ECF No. 13-1 at 391.  X-rays showed well-healed fractures of the right tibia and fibula without evidence of active osteomyelitis (ECF NO. 13-1 at 409).  Melton was referred to the LSU Orthopedic Clinic.  ECF No. 13-1 at 391.  Melton's Lortab was stopped and he was prescribed hydrocodone.  ECF No. 13-1 at 391.

In October 2014, Melton continued to complain of daily pain in his right lower leg (mid-leg to ankle) associated with his old fracture.  ECF No. 13-1 at 393.  Melton reported the pain was controlled with hydrocodone.  ECF No. 13-1 at 393.  Melton's right knee, foot, and ankle had full ranges of motion without joint deformity, heat, swelling, erythema or effusion, and ligament instability.  ECF NO. 13-1 at 394. Melton's hydrocodone prescription was continued and he was also prescribed naproxen.  ECF No. 13-1 at 394.

In November 2014 at the Medical Center, Melton again reported chronic pain in his right leg/ankle, stating he had been struck by a car and suffered a compound fracture of the right tibia in 1995.  ECF No. 13-1 at 396.  Melton's right leg had old scars but no edema or tenderness, and his range of motion was normal.  ECF No. 13-1 at 397.  Melton also complained of some lower back stiffness, but did not report a previous back injury.  ECF No. 13-1 at 396.  Melton was noted to be confrontational but not truly agitated.  ECF No. 13-1 at 397.  Melton's refills had been on time but he had obtained short supplies from two different ER doctors. ECF No. 13-1 at 397.  Melton's hydrocodone was stopped, and his naproxen and Tegretol were refilled.  ECF No. 13-1 at 397.

In January 2015 at the Medical Center, Melton again reported pain and requested a refill of his Norco prescription.  ECF No. 13-1 at 398.  Melton had normal range of motion and muscle strength, and stability in all extremities without pain.  ECF No. 13-1 at 398.  Melton was prescribed hydrocodone, naproxen and Tegretol.  ECF No. 13-1 at 398-99.  Melton returned in February 2015 and was

noted to be four days early on pain medications.  ECF No. 13-1 at 401.  Melton had an abnormal urine drug screen ("UDS") in December 2014 that  was  positive for amphetamines and negative for opiates.  ECF NO. 13-1 at 401, 405.  Melton said he wanted to discontinue opiates by "weaning down" and denied amphetamine use.  ECF NO. 13-1 at 401.  Melton weighed 250 pounds and his blood pressure was 137/85.  ECF NO. 13-1 at 402.  Melton was diagnosed with benign hypertension and his medications were refilled.  ECF NO. 13-1 at 402.  In February 2015, Melton's UDS was negative for amphetamines but positive for cannabinoid.  ECF NO. 13-1 at 404.

X-rays in January 2015 showed Melton had minimal arthritis in the left knee (ECF No. 13-1 at 408).

On January 18, 2015, Melton went to the emergency room with complaints of severe hip pain.  ECF No. 13-1 at 623.  Melton weighed 243 pounds and ambulated without difficulty.   ECF No. 13-1 at 623, 631.   X-rays showed no fractures or dislocation and minimal arthritis in the knee.  ECF No. 13-1 at 634.  Melton was diagnosed with hip pain and joint pelvis/thigh pain, and prescribed Toradol and Percocet.  ECF No. 13-1 at 623.

In March 2015, Melton was evaluated by Dr. Tony Hanna, a psychiatrist at Magellan Health Services (part of the Louisiana Behavioral Health Management Partnership).  ECF No. 13-1 at 776.  Dr. Hanna noted that Melton had been diagnosed with bipolar I-manic by Dr. Gad in 2001 and started on Tegretol.  ECF No. 13-1 at 776.  Melton's complaint was that he was easily irritable.  ECF No. 13-1

at 776.  Dr. Hanna diagnosed bipolar I disorder and tobacco use disorder, and continued his Tegretol and Trazadone.  ECF No. 13-1 at 777.

Melton was seen by the Louisiana Office of Behavioral Health (Magellan and Caring Choices) from March through August 2015 for refills of his Trazadone, Tegretol, and Risperdal.  ECF No. 13-1 at 771, 774-75, 778-79.

In April 2015, Melton reported mild, chronic, bilateral back pain at the emergency room and sked for a refill of Ultram (tramadol), although he had not seen his primary care provider.  ECF No. 13-1 at 649.  Melton had a mild limitation in the range of motion in his back.  ECF No. 13-1 at 650.  Melton was diagnosed with back pain and prescribed Tramadol.  ECF No. 13-1 at 654-55.

On June 14, 2015, Melton again complained in the emergency room of mild back pain, and admitted he was there because he could not afford to go to his doctor. ECF No. 13-1 at 658.  Melton had lumbar pain on movement and tenderness, but a full range of motion.  ECF No. 13-1 at 659.  Melton was diagnosed with back strain and pain, and prescribed Ultram and metaxalone.  ECF No. 13-1 at 658.

In May 2015, Melton saw Dr. Roy Reuben at Magellan Health Services.  ECF No. 13-1 at 773.  Dr. Reuben noted that Melton had been taking the wrong dose of his Tegretol (less than half of the amount prescribed) and corrected it, increased his Trazadone for sleep, and started him on Risperdal for anger management.  ECF No. 13-1 at 773.  Dr. Reuben told Melton the Risperdal would not stop his anger, but would give him "an extra moment in which to control its expression."  ECF No. 13-1

at 772.  In June 2015, Melton was counseled by Beverly Alexander, M.S., L.P.C., at Caring Choices of Jonesville, for his complaints of anger.  ECF No. 13-1 at 772.

In September 2015, Melton went to the emergency room for a moderate panic attack.  ECF No. 13-1 at 717-18.  Melton was anxious and not coping.  ECF No. 13-1 at 719.  Melton was diagnosed with generalized anxiety disorder and prescribed Ativan.  ECF No. 13-1 at 717.

In October 2015, Melton went to the emergency room complaining of moderate shoulder pain that was chronic and episodic (occasional), post-rotator cuff surgery.  ECF No. 13-1 at 707.  The pain started in his shoulder and radiated to his hand.  ECF No. 13-1 at 711.  Melton was diagnosed with arthralgia and prescribed Norco and Flexeril.  ECF No. 13-1 at 707.

In November 2015, Dr. Judith Levy, Ph. D. evaluated Melton's medical records at the request of the SSA.  ECF No. 13-1 at 94.  Dr. Levy found Melton suffers from an affective disorder that does not meet Listing 12.04.  ECF No. 13-1 at 95.  Dr. Levy found that Melton has: a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Dr. Levy also found Melton has limitations in social interactions: moderately limited ability to interact appropriately with the general public; moderately limited ability to accept instructions and respond appropriately to criticism from supervisors; moderately limited ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and moderately limited ability

12

to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  ECF No. 13-1 at 99.  Dr. Levy concluded that Melton's ability to deal with coworkers and the public is somewhat reduced but adequate to handle brief and superficial contact.  ECF No. 13-1 at 99.  Melton's ability to tolerate and respond appropriately to supervision is also reduced but adequate to handle ordinary levels of supervision in the customary work setting.  ECF No. 13-1 at 99.

Also in November 2015, Dr. B. Tillman performed a disability examination of Melton.  ECF No. 13-1 at 674.  Melton stated he cannot work because of leg and back problems stemming from a motor vehicle accident in 1995.  ECF No. 1301 at 674.  Melton suffered right leg and left ankle injuries and was hospitalized for two weeks, had metal plates put in his left ankle and a rod put in his right leg, and now has pain in both areas.  ECF No. 13-1 at 674.  Melton complained that his legs are unstable and "give out," and that he has chronic low back pain daily.  ECF No. 13-1 at 674.  Melton said his bipolar disorder that makes it difficult for him to control his behavior and he "blows up" at people  ECF No. 13-1 at 674.  Melton said he hits trees, not people.  ECF No. 13-1 at 674.  Melton lives with his wife, and does not do anything at home because of his physical complaints.  ECF No. 13-1 at 674.  ECF No. 13-1 at 674.  Melton has a high school education, smokes a pack of cigarettes per day, and last worked in December 2014 as a police officer.  ECF NO. 13-1 at 674.

Dr. Tilman reviewed Melton's medical records from the Catahoula Parish Hospital District clinics and conducted a physical exam. ECF NO. 13-1 at 675. Dr. Tilman found Melton was six feet tall, weighed 252 pounds, and his blood pressure was 132/80. ECF No. 13-1 at 675. Melton walked with a right limp but had no neurologic deficits of gait, and had "fairly normal" ranges of motion although movement was slow. ECF No. 13-1 at 675-76. A lumbosacral spine x-ray showed L5-S1 interspace narrowing with minimal hypertrophic spurring on L4 and L5. ECF No. 13-1 at 676. Dr. Tilman diagnosed chronic low back pain with some decrease in range of motion but no neurologic deficits and minimal x-ray changes of the lumber spine; obesity; decreased distant visual acuity corrected with lenses; bipolar disorder; and history of injury to the right leg and left ankle with fairly well-preserved lower extremity function. ECF NO. 13-1 at 676.

In January 2016, Melton asked for a letter stating he cannot work. ECF No. 13-1 at 678. Melton's problems were listed as: chronic anxiety state; chronic benign essential hypertension; chronic depressive disorder; chronic bipolar I disorder; chronic methicillin resistant; staphylococcus aureus infection; and radiculitis (thoracic or lumber). ECF No. 13-1 at 678.

In February 2016, Melton was counseled Beverly Alexander, M.S., L.P.C., for his complaints of bipolar, anger, and easily agitated. ECF NO. 13-1 at 761. Melton stated his anger interferes with social and occupational functioning and causes marital difficulties. ECF No. 13-1 at 761. Alexander estimated the severity of Melton's problem to be moderate. ECF No. 13-1 at 761. Melton was hospitalized in

14

the past for psychiatric reasons and had been treated as an outpatient.  ECF No. 13-1 at 763.  Melton attended his appointments sporadically and stayed on his medication–Remeron, Tegretol, and Risperdal–which was helpful.  ECF No. 13-1 at 763.  Melton still occasionally gets angry and "dwells on things."  ECF No. 13-1 at 763.  Melton was 42 years old, married, and living on his wife's disability check in his grandmother's house.  ECF No. 13-1 at 763.  Melton attended school through the tenth grade and had a GED.  ECF No. 13-1 at 763.  Melton was diagnosed with intermittent explosive disorder and "other specific personality disorders," and scheduled for a psychiatric consultation.  ECF NO. 13-1 at 765.

In July 2016, Melton was examined by Dr. Ibrahim Seki.  ECF No. 13-1 at 744.  Melton complained of anxiety, nervousness, and sleep problems.  ECF No. 13-1 at  745.  Melton weighed 270 pounds and his blood pressure was 140/98.  ECF No. 13-1 at 745.  Melton was diagnosed with bipolar I disorder, hypertensive disorder, generalized anxiety disorder, anemia, urinary tract infection, and lipoprotein deficiency.   ECF No. 13-1 at 746.   Melton was prescribed Venlafaxine (an antidepressant) and Lisinopril (for high blood pressure).  ECF No. 13-1 at 747.  Later the same month, Melton's blood pressure was 150/100.  ECF No. 13-1 at 755.  Melton was diagnosed with elevated blood pressure, pain and arthralgia in the right ankle and foot, bipolar disorder, and knee pain (right).  ECF No. 13-1 at 756.  Dr. Seki prescribed counseling for nutrition and physical activity and tobacco use cessation counseling.  ECF No. 13-1 at 756,

Melton returned to Dr. Seki in July 2016, complaining of musculoskeletal pain. ECF No. 13-1 at 730. Dr. Seki referred Melton to Dr. Fairbanks for evaluation. ECF NO. 13-1 at 730. Later in July, Melton returned to Dr. Seki with complaints of depression, anxiety, and nervousness. ECF No. 13-1 at 739. Melton was diagnosed with major depressive disorder, single episode, and prescribed Venlafaxine (Effexor) and Lisinopril. ECF No. 13-1 at 740. Melton also complained of "anger tantrum," impatience, anxiety, and insomnia (despite taking Remeron), and was diagnosed with generalized anxiety disorder, irritability, and anger. ECF No. 13-1 at 744, 746.

In August 2016, Melton reported continued but improved depression. ECF No. 13-1 at 741. Melton's Effexor was refilled. ECF No. 13-1 at 743. In September 2016, Dr. Seki noted that Melton's depression had improved and his bipolar disorder was stable. ECF No. 13-1 at 733. Melton's Norco was refilled. ECF No. 13-1 at 736.

On October 19, 2016, Melton was evaluated by Dr. J.H. Fairbanks, an orthopedist, for complaints of new left shoulder pain and new right ankle pain. ECF NO. 13-1 at 725. The shoulder pain was dull, nagging, and penetrated the entire shoulder; was precipitated by reaching and repetitive lifting; and was aggravated by all overhead activities and reaching up. ECF No. 13-1 at 725. Melton's ankle pain was nagging, raw, and throbbing; without referred or radiating pain, numbness, or tingling; was aggravated by walking; was relieved by sitting down; and caused moderate functional impairment that interfered only with some

16

daily activities.  ECF No. 13-1 at 725.  Melton weighed 279 pounds.  ECF No. 13-1 at 726.  Melton was assessed with impingement syndrome of the left shoulder and pain in the right ankle and joints of the right foot.  ECF No. 13-1 at 727.  Melton was prescribed Meloxicam and Tramadol and was given an injection in his left shoulder.  ECF NO. 13-1 at 727-28.

Melton saw Dr. Seki in October 2016 for leg pain and limited range of motion, and ankle and knee pain with limited range of motion.  ECF No. 13-1 at 732.  Dr. Seki diagnosed chronic pain and prescribed weight loss, exercise, and Norco.  ECF No. 13-1 at 733.

In November 2016, Melton was evaluated by Dr. Robert DeTrinis, Ph.D. from Caring Choices of Jonesville.  ECF No. 13-1 at 768.  Melton told Dr. DeTrinis that he occasionally loses control of his anger, and that he is applying for disability for physical reasons.  ECF No. 13-1 at 768.  Dr. DeTrinis was not sure how much Melton's personality disorder contributes to his anger, and noted that Melton was not sleeping well, which could also contribute to his irritability.  ECF No. 13-1 at 769.  Melton's Tegretol was refilled, his Trazadone was decreased (to be stopped in a month), his Risperdal was increased, and Remeron was prescribed to facilitate sleep and possibly help with Melton's temper.  ECR NO. 13-1 at 769.

### 2.  Administrative Hearing

At the time of his December 2016 administrative hearing, Melton was 43 years old, was 5' 11" tall, and weighed about 280 pounds.  ECF No. 13-1 at 36.  Melton had a tenth grade education and a GED.  ECF No. 13-1 at 37.  Melton lived

with his wife.  ECF No. 13-1 at 37.  Melton testified that he drives once or twice a week.  ECF No. 13-1 at 37.  Melton lasted worked from 2009 to February 15, 2015 as a city police officer.  ECF No. 13-1 at 38, 219.  Prior to that, Melton did construction work as a "gofer" from 2001-2008.  ECF No. 13-1 at 38, 219.  Melton explained that he has difficulty comprehending blueprints and what his supervisors want him to do.  ECF No. 13-1 at 39.  Melton testified that he became disabled on February 15, 2015, when his back started hurting a lot more, which made him have more difficulty "taking authority."  ECF No. 13-1 at 39.

Melton testified that, when he gets out of bed (or his recliner), he has terrible pain in his lower back that goes down his left leg, or both legs, and his pelvis.  ECF No. 13-1 at 40.  Sitting in a recliner or lying down lessen the pain.  ECF No. 13-1 at 40.  Kneeling or trying to squat worsen the pain.  ECF No. 13-1 at 41.  Walking is painful, so if he goes shopping, he rides on an electric chair-cart. ECF No. 13-1 at 40-41.  Melton can stand for a little while, but has to alternate sitting and standing. ECF No. 13-1 at 41.  Melton said he uses a cane to walk, but it was not prescribed by a doctor.  ECF No. 13-1 at 41.

Melton testified that his knees sometimes buckle, causing him to fall.  ECF No. 13-1 at 41.  He can be on his feet 10 to 20 minutes before he needs a break, and can sit in an office chair for 30 to 40 minute intervals on a "decent day."  ECF No. 13-1 at 51.  Melton can reach forward but not overhead, and cannot lift a gallon of milk, but can lift a smaller container.  ECF No. 13-1 at 51.  Lifting causes Melton's back and shoulder to hurt.  ECF No. 13-1 at 51.  If he drops something, he uses a

grabber or asks someone else to pick it up.  ECF No. 13-1 at 51.  Melton also testified that he has trouble with gripping, such as to squeeze a stapler or to shake hands.  ECF No. 13-1 at 51.  Heat aggravates Melton's temper.  ECF No. 13-1 at 51.

Melton testified that he has been diagnosed with bipolar disorder and explosive disorder.  ECF No. 13-1 at 42.  Melton does not like "authority" or being told what to do, and would yell at his supervisors.  ECF No. 13-1 at 42.  Melton does not like to deal with people because they make him angry.  ECF No. 13-1 at 51.

On an average day, Melton gets up and brushes his teeth, then watches TV.  ECF No. 13-1 at 42.  Melton does not grocery shop, but he might go to the store with his wife and ride in an electric cart.  ECF No. 13-1 at 42.  Melton testified that the most that he can pick up and carry is less than a glass of milk.  ECF No. 13-1 at 43.  Melton likes to visit people sometimes, but usually prefers to be alone due to paranoid feelings.  ECF No. 13-1 at 43.  Melton does not sweep or mop because he cannot stoop down or bend and pick up, and he has shoulder problems.  ECF No. 13-1 at 43-44.  Melton only cooks in the microwave.  ECF No. 13-1 at 43.  When he feels good, he likes to do arts and crafts.  ECF No. 13-1 at 46.

Melton said his doctors told him not to bend or lift to avoid aggravating his back and shoulder problems.  ECF No. 13-1 at 44.  Melton testified that physical therapy, surgery, and injections have not been recommended.  ECF No. 13-1 at 44.  Melton received an injection in his shoulder for pain at Fairbanks Orthopedic, but it did not help.  ECF No. 13-1 at 46.

Melton goes to "mental health" to see a doctor and a counselor.  ECF No. 13-1 at 44-45.    Melton used to go to Jonesville Mental Health, but recently began receiving Medicaid and going to Phoenix Service [Family Life Center] in Vidalia.  ECF No. 13-1 at 45.    Melton also sees Dr. Seki, his family practitioner, who prescribes his Remeron, Tegretol, and Lamictal.  ECF No. 13-1 at 45.  Melton also takes medication to help him sleep.  ECF No. 13-1 at 47.

Melton's bipolar disorder is both manic and depressive.  ECF No. 13-1 at 47.  Melton has become violent–he puts holes in walls, head-butts, and jumps out of moving cars.  ECF No. 13-1 at 46.  Melton becomes very depressed and suicidal.  ECF No. 13-1 at 47.    Melton has bene hospitalized between 15 and 22 times for his mental health problems, most recently about 12 years ago.  ECF No. 13-1 at 48.  Melton is taking Tegretol, Remeron (for sleep), Norco (7/15) (once a day for pain), and Lamictal.  ECF No. 13-1 at 49.  Melton has dizziness and nausea side effects from Tegretol and Norco.  ECF No. 13-1 at 50.  Melton said the Lamictal makes him feel like people are "looking at [him] crazy."  ECF No. 13-1 at 50.

Melton worked as a police officer for six years, first for the Village of Clayton and then for the Town of Waterproof.  ECF No. 13-1 at 52-53, 197-200.  Melton left the Waterproof Police Department because he had a problem with "authority" and with people, and he had a "falling out" with his boss (the Chief of Police).  ECF No. 13-1 at 53-54.  Several people had called the police department and complained about him.  ECF No. 13-1 at 53.  Melton's boss told him to use the police department's system for writing tickets, but Melton did not want to do it that way.

ECF No. 13-1 at 53.  Melton also missed a lot of time from work in the last six months of his employment.  ECF No. 13-1 at 54.  Sometimes Melton did not go to work because he did not want to, and sometimes he did not go because he was in pain.  ECF No. 13-1 at 54.  Melton's boss warned him to "straighten up" or he would have to find another job.  ECF No. 13-1 at 54.  Melton then missed another week of work, so Melton quit.  ECF No. 13-1 at 54-55.

On a really bad day, Melton cannot get out of bed and he does not want anyone to bother him.  ECF No. 13-1 at 55.  Melton's "really bad day" is caused by both pain and his bipolar disorder.  ECF NO. 13-1 at 56.  He might just lay around and watch TV.  ECF No. 13-1 at 56.  Melton's "regular" bad days are caused by his bipolar disorder, which he always has.  ECF No. 13-1 at 56.  Melton's pain comes and goes, and sometimes is worse.  ECF No. 13-1 at 56.  In a month, Melton has slightly more bad days than good days.  ECF No. 13-1 at 57.

The VE testified that Melton's past work as a construction laborer (DOC[3] 869.687-026) was very heavy, SVP 2,[4] and unskilled  ECF No. 13-1 at 58.  Melton's

---

[3] Dictionary of Occupational Titles.  "The Dictionary of Occupational Titles (the "DOT") is a United States Department of Labor publication.  The DOT gives a job type a specific code—for example, "295.467–026 Automobile Rental Clerk"—and establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job.  Because of the detailed information appended to each DOT code, the codes are useful for determining the type of work a disability applicant can perform."  *Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 446 (2d Cir. 2012).

[4] SVP, or Specific Vocational Preparation, refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a particular occupation.  *See* Dictionary of Occupational Titles ("DOT"), App. C (rev. 4th ed.1991).  Unskilled work usually requires less than thirty days training, which corresponds to an SVP of 1 or 2; semi-skilled work corresponds to an SVP of 3 or 4; and skilled work requires an SVP level of 5 or higher.  *See* Social Security Ruling 00–4p, 2000 WL 1898704, at *3 (2000); *see also* 20 C.F.R. § 404.1568.

past work as a police officer (DOC 379.263-014) was very heavy, SV 2, and skilled. ECF No. 13-1 at 58.  Melton does not have any transferable skills for sedentary work.  ECF No. 13-1 at 58.

The ALJ posed a first hypothetical involving: a 43 year old man with a GED and Melton's past relevant work; with some degenerative disc disease that results in back pain, and a previous shoulder injury; can lift up to 10 pounds; can walk/stand up to two hours out of eight and sit up to six hours out of eight; requires a sit-stand option; cannot work above the shoulder; cannot climb, balance, or work on an uneven surface; cannot interact with the public; can only occasionally interact with coworkers; cannot work in teams or groups; and must work mainly with things rather than people.  ECF No. 13-1 at 59.  The VE testified that such a person could work as: a cutter and paster (sedentary, SVP 2, unskilled, DOC 249.587-014) (194,977 jobs exist nationally and 2,550 in Louisiana); document preparer (sedentary, SVP 2, unskilled, DOC 249.587-018) (267,379 jobs exist nationally and 3,497 in Louisiana); and final assembly worker (sedentary, SVP 2, unskilled, DOC 713.687-018) (27,423 jobs exist nationally and 907 in Louisiana).  ECF No. 13-1 at 59-60.

The ALJ posed a second hypothetical involving the person described in hypothetical one and adding the need to use a cane to walk and stand.  ECF No. 13-1 at 60.  The VE testified that if the cane is necessary to stand, there would be no work available that the person can do.  ECF No. 13-1 at 60.  However, if the cane is only needed for ambulation, the person could do the jobs described for the first

hypothetical.  ECF No. 13-1 at 60.  The VE explained that, since the person requires a sit-stand option to work, he would have to work one-handed while standing and holding onto a cane; therefore, he could not perform work.  ECF No. 13-1 at 60.

The ALJ posed a third hypothetical involving the person described in hypothetical one but the person can only rarely interact with coworkers.  ECF No. 13-1 at 60.  The VE testified that the opportunity to have no contact or rare contact with coworkers is severely limited in jobs,[5] and there would not be any jobs for such an individual.  ECF No. 13-1 at 60.

If the individual needed to miss work (by arriving late, leaving early, or not showing up at all) because of physical or psychological problems, he could not miss more than one entire day per month, but could be tardy a little more than that.  ECF No. 13-1 at 61.  No more than one additional break is likely to be tolerated if the individual is upset or angry or needs to be alone.  ECF No. 13-1 at 61-62.  Verbal or physical aggression would not be tolerated.  ECF No. 13-1 at 62.  If the individual has to miss two or more days or work per month, he would not be able to maintain employment.  ECF No. 13-1 at 72.

The VE testified that the DOC was last updated in 1991, and the job of "cutter and paster" (for press clippings) would no longer be done exactly the way it is described in the DOC, but would still be sedentary, unskilled work.  ECF No. 13-1 at 63-64.  The VE testified that most of the jobs listed have had changes, but the

---

[5] Only three of the 12,760 plus jobs described in the *Dictionary of Occupational Titles* are classified as working alone.  ECF No. 13-1 at 60.

central elements of the work (such as sedentary, unskilled) have not changed. ECF No. 13-1 at 64.

The VE also testified that the job numbers come from information provided by the United States Department of Labor and compiled by Job Browser Pro and SkillTRAN. ECF No. 13-1 at 65. That information provides estimates of jobs available. ECF No. 13-1 at 67. The VE explained that the Job Browser Pro software takes into account certain assumptions concerning DOT occupations and industry context. ECF No. 13-1 at 71.

## C.    ALJ's Findings and Conclusions

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Melton (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. den.*, 514 U.S. 1120 (1995) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the

burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  *See Greenspan*, 38 F.3d at 237.

In the case at bar, the ALJ found that Melton has not engaged in substantial gainful activity since February 15, 2015 (ECF No. 13-1 at 19).  The ALJ found Melton has severe impairments of degenerative disc disease and left shoulder impingement; residuals from a motor vehicle accident in 1995 including bilateral lower extremity pain; obesity; bipolar disorder; intermittent explosive disorder; anxiety; and depression (ECF No. 13-1 at 19).  The ALJ found Melton does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix I (ECF No. 13-1 at 20).  The ALJ also found that Melton is unable to perform his past relevant work as a construction laborer and a police officer (Tr. p. 26).

At Step No. 5 of the sequential process, the ALJ found that Melton has the residual functional capacity to perform the full range of sedentary work except as reduced by: his need for a sit/stand option; his inability to perform above-the-shoulder work; his inability to climb, balance, or work on uneven surfaces; his inability to interact with the public; his inability to have more than occasional interaction with coworkers; his inability to engage in team work; and his need to work primarily with things rather than people.  ECF No. 13-1 at 21-22.  The ALJ

found that Melton is a younger individual with a high school education, and the transferability of work skills is immaterial.  ECF No. 13-1 at 27.

The ALJ concluded there are a significant number of jobs existing in the national economy that Melton can perform, such as cutter/paster (sedentary; unskilled; DOT 249.587-014; 194, 977 jobs in the national economy); document preparer (sedentary; unskilled; DOT 290.587-018; 267,379 jobs in the national economy); and final assembler (sedentary; unskilled; DOT 713.687-018; 27,423 jobs in the national economy).  ECF No. 13-1 at 27.  Therefore, Melton was not under a "disability" as defined in the Social Security Act at any time from February 15, 2015 (the date he last worked) through the date of the ALJ's decision on April 3, 2017. ECF No. 13-1 at 28.

### D.   ALJ's Supplemental Findings as to Melton's prior disability determination.

The administrative record and a letter from Melton's parents (attached to Melton's brief) show that Melton previously applied for disability benefits in 1995 and was granted benefits in 1997, following his recovery from being hit by a motor vehicle.[6]  ECF No. 13-1 at 205; No. 18 at 9.  Melton's parents state in their letter that Melton continued to receive disability benefits while working.  ECF No. 18 at 9.

---

[6] Melton's parents state that Melton was struck by a motor vehicle driven by a drunk driver as he was walking on the shoulder of the road.  ECF No. 18 at 8.  Melton had kidney damage, broken bones in both legs, a broken left ankle, and a cracked skull, and had screws in pins put in both legs.  ECF No. 18 at 8.  It was two years before Melton was walking again.  ECF No. 18 at 9.

The administrative record shows the record of Melton's 1995 claim and benefits award was not requested by the Field Office. ECF No. 13-1 at 205. Therefore, it does not appear the ALJ was informed of Melton's previous award of disability benefits.

This case was remanded to the Commissioner of Social Security pursuant to sentence six of 42 U.S.C. § 405(g) for the taking of additional evidence and for additional review and consideration as to: (1) the new evidence that Melton was previously found disabled by the SSA; (2) whether Melton's disability status was terminated; and (3) whether Melton worked while he received disability benefits. ECF No. 21.

The ALJ filed supplemental findings in response to the Court's order. ECF No. 22 at 3. The stated that she ALJ held a supplemental hearing at which Melton and an SSA Claims Technical Expert testified. ECF No. 22 at 4. The ALJ also appears to have obtained Melton's other claims records from the SSA to determine what occurred with Melton's prior benefits. ECF NO. 22 at 4. Neither the supplemental administrative hearing transcript nor the additional administrative records have been submitted to this Court. ECF No. 18 at p. 2. However, that evidence is not relevant to the current disability determination. The ALJ's supplemental findings make it clear that Melton's previous benefits were terminated because he engaged in substantial gainful activity after his trial work period ended.[7]

---

[7] 42 USC § 423 (e)(1):
    (e) Engaging in substantial gainful activity

Melton was granted SSI benefits in 1997 due to both physical and mental disabilities, with a disability onset date of March 26, 1995. ECF No. 22 at p. 4. The ALJ explained that, in 2007, Melton began participating in the SSA's "Ticket to Work Program," which allows claimants to whom benefits are granted to return to work and, under certain circumstances, continue to receive benefits.[8] *See Ticket to Work and Work Incentives Improvement Act of 1999*, 42 U.S.C. § 1305, *et seq.; see also* 20 C.F.R. § 411.100, *et seq.* ECF No. 22 at 4. Melton participated in the trial work program, while continuing to receive benefits, in 2001 through 2005. ECF No. 22 at pp. 4, 5. Melton then began a 36 month extended period of eligibility from

(1) No benefit shall be payable under subsection (d)(1)(B)(ii), (d)(6)(A)(ii), (d)(6)(B), (e)(1)(B)(ii), or (f)(1)(B)(ii) of section 402 of this title or under subsection (a)(1) of this section to an individual for any month, after the third month, in which he engages in substantial gainful activity during the 36-month period following the end of his trial work period determined by application of section 422(c)(4)(A) of this title.

[8] A "trial work period" is a period of time during which an individual who has been found disabled may test his or her ability to work and still be considered disabled. 20 C.F.R. § 404.1592(a); *See Smith v. Social Security Administration,* 538 Fed. Appx. 484, 485 at n. 1 (5th Cir. 2013). The period consists of performance of "services" during nine months, which do not need to be consecutive months, but which must occur within a period of sixty consecutive months. *See Smith,* 538 Fed. Appx. at 485 at n.1; 20 C.F.R. § 404.1592(a), (e).

An "extended period of eligibility," also called the "re-entitlement period," is an additional period after the trial work period during which an individual with a disabling impairment can continue to test his or her ability to work. *See Smith,* 538 Fed. Appx. at 486 at n. 2; 20 C.F.R. § 404.1592a(a). The extended period of eligibility lasts for 36 continuous months after the end of the trial work period. *See Smith,* 538 Fed. Appx. at 486 at n. 2; 20 C.F.R. § 404.1592a(b)(ii). However, if the individual performs substantial gainful activity during the extended period of eligibility, the SSA may find that the individual's disability has ceased and suspend payment of benefits. *See Smith,* 538 Fed. Appx. at 486 at n. 2; 20 C.F.R. § 404.1592a(a). If the individual stops performing substantial gainful activity during the extended period of eligibility, the SSA will resume payment of benefits. *See Smith,* 538 Fed. Appx. at 486 at n. 2; 20 C.F.R. § 404.1592a(a). If an individual's disability ceases during the extended period of eligibility due to substantial gainful activity, his or her entitlement to benefits terminates the first month after the end of the extended period of eligibility in which he or she again performed substantial gainful activity. *See Smith,* 538 Fed. Appx. at 486 at n. 2; 20 C.F.R. § 404.1592a(a)(3)(I).

February 2005 through January 2008, when his benefits were suspended and subsequently terminated after March 2008. ECF No. 22 at p. 5. Melton began working full time in 2007 and continued to do so through 2014. ECF No. 22 at p. 4. However, at some point, Melton exceeded the earnings limits.[9] ECF No. 22 at p. 4. The ALJ explained that Melton exceeded the amount of work he was permitted to do and still receive benefits. "In January 2009 he requested expedited reinstatement of his benefits, but this request was denied . . . because the claimant was working at SGA [substantial gainful activity]."[10] ECF No. 22 at 6. The SSA found Melton's disability had ended because he was engaged in substantial gainful activity.[11] ECF No. 22 at 6. The ALJ found that Melton's previous grant of benefits was terminated solely on the basis of work that exceeded the allowable limits for earning from work activity." ECF No. 22 at 6.

Because Melton's previous disability had ended, the ALJ correctly made a *de novo* determination of whether Melton was disabled from February 15, 2015 to April 3, 2017.

---

[9] As a result, Melton's SSI benefits were overpaid by the SSA, resulting in Melton owing the SSA $12,961.80. ECF No. 22 at 5.

[10] An expedited reinstatement of benefits requires proof that the claimant is unable to do substantial gainful activity because of his medical condition. *See* 20 C.F.R. § 404.1592b, *et seq.*

[11] If a claimant is engaged in substantial gainful activity and any applicable trial work period has been completed, the disability will be found to have ended. *See* 20 C.F.R. § 404.1594(f)(1); *see also Blake v. Berry hill*, 2018 WL 4103231, at *2 (S.D. Tex. 2018); *Michalak v. Weinberger*, 416 F. Supp. 1213, 1214 (S.D. Tex. 1976).

## II.   Law and Analysis

### A.   Scope of Review.

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. *See McQueen v. Apfel*, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  *See Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. *See Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. *See Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987); *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. *See Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981); *see also Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).  A court does have authority, however, to set aside factual findings that

are not supported by substantial evidence and to correct errors of law. *See Dellolio*, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson v. Bowen*, 864 F.2d 340 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125.

**B.** **Substantial evidence supports the ALJ's/Commissioner's finding that Melton can work.**

Melton contends in his brief that he is disable and cannot work because he cannot finish work; he gets mad when someone tells him what to do; he hears voices telling him that people are out to get him and he should hurt them; he is depressed; he has a learning disability; and he has back and leg pain.  ECF No. 18 at 2.

Although the ALJ failed to mention Melton's learning disability, she noted that Melton had a tenth grade education and a GED.  Melton, his wife, and his parents all raised this issue in their letters.  An SSA request for Melton's education records elicited a response that shows Melton was last evaluated on December 15, 1989 and was found to have a "specific learning disability," but that his records had since been destroyed.  ECF No. 13-1 at 227.  Melton's parents stated in their letter that, when Melton was in the third grade, the school psychologist tested him and found learning disabilities.  ECF No. 18 at 6.  In Melton's disability report, Melton stated that he took special education classes at Vidalia High School from 1990-1993. ECF No. 13-1 at 210.

The ALJ found that Melton can do unskilled work.  Because Melton's learning disability clearly did not prevent him from doing both unskilled and skilled

31

work in the past, Melton has not shown that his learning disability precludes him from doing unskilled work now.

Melton also contends his cannot work due to his bipolar disorder–he is unable to finish work; he gets mad when someone tells him what to do; he hears voices telling him that people are out to get him and he should hurt them; and he is depressed. Although Melton's medical records do not go back very far, Melton's parents state in their letter that he was diagnosed as bipolar when he was 16 years old. ECF No. 18 at 7. Thus, Melton has apparently had his bipolar disorder for his entire adulthood. Yet Melton has held several jobs, from 1990 through 2016, despite his bipolar disorder. ECF No. 13-1 at 193-203. There is no evidence that Melton's condition has worsened. No doctor has stated that Melton cannot work. Therefore, substantial evidence supports the ALJ's finding that Melton is not disabled by his bipolar disorder.

Finally, Melton contends he cannot work due to back and leg pain. The mere existence of pain is not an automatic ground for obtaining disability benefits. The factual determination of whether the claimant is able to work despite some pain is within the discretion of the Administrative Law Judge and will be upheld if supported by substantial evidence. *See Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980). A claimant's symptoms, including pain, will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence.

32

See 20 C.F.R. §404.1529(c)(4); *see also Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2000). Although severe pain can constitute a nonexertional impairment, pain is a disabling condition only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Chambliss*, 269 F.3d at 522.

While pain can be severe enough to create a disabling condition, the evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983). Such a credibility determination is within the province of the ALJ. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 128-29 (5th Cir. 1991). The ALJ's decision on the severity of pain is entitled to considerable judicial deference. *See James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986); *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. *See Falco v. Shalala*, 27 F.3d 162, 163-64 (5th Cir. 1994).

The ALJ made the following findings as to Melton's pain and credibility (ECF No. 13-1 at 23, 25, 26):

> The objective medical evidence has not fully supported the claimant's alleged loss of functioning. The residual functional capacity assessment has been reasonably supported by the objective medical evidence and the record as a whole. . . .

The undersigned has considered the claimant's treatment. He has been treated conservatively since his alleged onset date with prescriptions for pain. He has also received an injection in his shoulder. He has not undergone physical therapy. He has not been recommended for more invasive treatment such as surgical intervention. His treating source has recommended he engage in exercise, which suggests that the claimant has not been precluded from all work activities.

The undersigned has further considered the claimant's daily activities. He has maintained [his] ability to drive, to care for his personal hygiene and needs, to prepare simple meals, and accompany his wife to the grocery store. He does arts and crafts for hobby while sitting in a chair. The performance of these activities has not shown where he has been precluded from all work activities. . . .

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the records for the reasons explained in this decision.

Since the ALJ in this case has made the mandatory indication of the basis for her credibility choices concerning claimant's complaints, and since her choices are not unreasonable, her finding that Melton's back and leg pain would not prevent him from performing a limited range of sedentary work is proper. *See Carry v. Heckler*, 750 F.2d 479, 485-86 (5th Cir. 1985).

Because substantial evidence supports the ALJ's/Commissioner's finding that Melton is not disabled, Melton's appeal should be denied.

## III.  <u>Conclusion</u>

Based on the foregoing, IT IS RECOMMENDED that Melton's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

SIGNED on Friday, February 26, 2021.

Joseph H.L. Perez-Montes
United States Magistrate Judge